In the Matter of the Arbitration between HELEN WHITING, INC., Appellant, and TROJAN TEXTILE CORP., Respondent.

Argued May 21, 1954; decided July 14, 1954.

*Erwin Feldman* and *Leon H. Klingher* for appellant.  I. There are no written contracts containing arbitration clauses.  (*Matter of Airedale Worsted Mills* [*Bonnie Classics*], 198 Misc. 259; *Matter of Albrecht Chemical Co.* [*Anderson Trading Corp.*], 298 N. Y. 437; *Matter of Tanenbaum Textile Co.* v. *Schlanger*, 287 N. Y. 400; *More* v. *New York Bowery Fire Ins. Co.*, 130 N. Y. 537; *Matter of Philip Export Corp.* v. *Leathertone, Inc.*, 275 App. Div. 102; *Blossom* v. *Dodd*, 43 N. Y. 264; *Klar* v. *H. & M. Parcel Room*, 270 App. Div. 538, 296 N. Y. 1044; *Dery* v. *Blate*, 209 App. Div. 467; *Matter of Catz Amer. Sales Corp.* v. *Holleb & Co.*, 272 App. Div. 689; *Matter of Gitelson & Sons* [*Weavetex Mills*], 274 App. Div. 480.)  II. The alleged contracts are unenforcible by reason of section 85 of the Personal Property Law.  (*Carter, Macy Co.* v. *Matthews*, 220 App. Div. 679, 247 N. Y. 532; *Matter of Airedale Worsted Mills* [*Bonnie Classics*], 198 Misc. 259; *Matter of Exeter Mfg. Co.* v. *Marrus*, 254 App. Div. 496; *Matter of Huxley*, 294 N. Y. 146.)

*Chester A. Lessler* for respondent. I. Findings of fact as determined by the Referee and sustained by the Appellate Division cannot be reversed by this court. (*Dulberg* v. *Equitable Life Assur. Soc.,* 277 N. Y. 17; *Angelos* v. *Mesevich,* 289 N. Y. 498.) II. A contract to arbitrate future controversies need not be signed by the party to be charged, but need only be in writing. (*Matter of Japan Cotton Trading Co.* v. *Farber,* 233 App. Div. 354; *Matter of Exeter Mfg. Co.* v. *Marrus,* 254 App. Div. 496.) III. The written contracts were accepted by petitioner as drawn. IV. The Statute of Frauds was satisfied and the acceptance of written contracts acknowledged by the cancellation of July 21, 1953, and/or the acceptance of a portion of the goods. (*Spiegel* v. *Lowenstein,* 162 App. Div. 443.)

DESMOND, J. Petitioner-appellant Helen Whiting, Inc., is a garment manufacturer with offices in New York City, while respondent Trojan Textile Corporation is a manufacturer of textiles with offices in the same city. On July 10, 1953, at petitioner's office, there was a discussion between persons representing the two corporations which discussion, according to respondent Trojan, resulted in an oral agreement by Whiting to buy from Trojan a total of about 83,000 yards of three different kinds of goods, all at the one price of 52½¢ per yard. Trojan claims that, on that same day, three written contracts were delivered by hand by Trojan to Whiting, that, three days later, on July 13, 1953, Trojan sent Whiting invoices for parts of each lot of goods, and that, on July 14, 1953, Whiting requested and got delivery of five yards against each of the three contracts, but that, on July 16, 1953, petitioner Whiting notified respondent Trojan, orally and by letter, that Whiting could use only one kind of the merchandise, and signed and sent back one only of the three contracts. Trojan, considering this as an effort by Whiting to cancel two of three contracts already made, refused to agree to it. On the back of each of the three original writings prepared by Trojan, there is a general arbitration clause, and Trojan demanded arbitration thereunder. Whiting, however, brought this proceeding to stay the arbitration, alleging that the negotiations between the parties never reached the stage of contract. Trojan, opposing the stay and praying for an order requiring Whiting to proceed to

arbitration, took the position, in an affidavit, that there was, on July 10, 1953, a completed oral contract for all the three kinds of goods, that written forms of agreement covering the whole transaction were immediately sent to Whiting, that Whiting held them for several days without returning them, that there was delivery of part of the quantity specified in each contract pursuant to order by Whiting, that Whiting had no right to cancel any of the three contracts, and that, so far as arbitration is concerned, there was no necessity for a signing by Whiting of the three papers containing the arbitration clauses, and that Whiting has never objected to the inclusion of arbitration clauses but has merely insisted on its alleged right to take one of the lots of goods on one of the written documents, and reject the other two.

Since there was thus set up an issue " as to the making of the contract " to arbitrate (Civ. Prac. Act, § 1450), Special Term made an order sending that issue to trial before Official Referee Isidor Wasservogel. The trial was had before the Official Referee, who held, as fact, that the parties had, on July 10, 1953, agreed on a purchase and sale of about 80,000 yards of these three kinds of cloth at 52½¢ per yard, that the agreement was, at the request of Whiting, that Trojan " bill and hold " all the goods, two of the quantities to be billed at once and the third to be billed on September 1, 1953, that, on the same day, Trojan sent Whiting three written confirmations, one for each lot, that Whiting held these three papers without signing or returning them until July 16th, and, in the meantime, ordered and got delivery of one five-yard piece against each of the three contracts, which three pieces Whiting accepted and has never returned, that these three deliveries, while small, satisfied the requirements of the Statute of Frauds (Personal Property Law, § 85), and that Whiting is bound to the arbitration agreement although it failed to sign two of the contracts. The Referee made an order adjudging that the contracts contained arbitration clauses which are binding upon the parties, and Special Term, on the Referee's report, made an order directing petitioner to proceed to arbitration. On petitioner's appeal to the Appellate Division, First Department, there was a three-to-two affirmance with no opinion by the majority but

a brief dissent which expressed the view of two Justices that there was no enforcible written contract to arbitrate, no partial delivery, and that the Statute of Frauds applies. Petitioner then appealed to this court as of right.

Petitioner argues here that the alleged contracts were unenforcible under the Statute of Frauds because not signed by petitioner, that the three small deliveries did not constitute partial deliveries under the Statute of Frauds, and that there was no enforcible contract to arbitrate. In the light of these contentions, we will examine briefly the proofs before the Referee. One Ozdoba, sales manager of Trojan but produced as a witness by Whiting, testified that on July 10, 1953, he called on Sterngold, president of Whiting, at the latter's office, with the purpose of selling Sterngold some merchandise, that Ozdoba showed Sterngold a number of samples, and that Sterngold picked out three and said that he would take the whole lot, that is, all that Trojan had of these three kinds, if he could get a special price for the whole, and, as a result of bargaining, the parties then and there came to an agreement for the sale and purchase of the whole of the three kinds at 52½¢ per yard for all, which, according to Ozdoba, was a large reduction in price. Ozdoba testified that, at Sterngold's request, and since the goods were for next year's manufacture and Sterngold did not have storage space, Ozdoba agreed to "bill * * * and hold" the goods, that is, charge them to Whiting on dates agreed upon, but hold them until called for. The arrangement, according to Ozdoba, was that he would go back to his office and prepare and send to Sterngold written contracts on the goods. There was no discussion about arbitration. Later the same day, Ozdoba prepared the three contracts and sent them over to Sterngold's office by delivery boy. The delivery boy confirmed the testimony of Sterngold that these contracts were not handed to Sterngold personally on Friday, July 10th. They did not reach Sterngold's hands until the Monday following. On Tuesday, July 14th, according to Ozdoba, Sterngold telephoned and asked for samples of each of the three kinds of merchandise, that is, five-yard pieces of each, which were delivered on Wednesday, July 15th, Sterngold meanwhile holding the three contracts or proposed contracts. It is,

we think, significant that on July 13th, which was Monday and three days after the conversation at Whiting's office, Trojan invoiced to Whiting substantial quantities of two of the three kinds of goods, apparently under the '' bill and hold '' arrangement, and that, on July 14th, four days after the contracts had been delivered to Whiting, Trojan billed Whiting for the three five-yard pieces, assigning those deliveries by number, to the three contracts in question. Sterngold, in his testimony, admitted that he read the face of each of these contracts but denied that he had read the reverse side on which appeared the arbitration clauses.

Sterngold, in his testimony on behalf of Whiting, confirmed that Ozdoba had come to Sterngold's office to sell the merchandise, that they decided on three patterns and on a reduced price of 52½¢ per yard for the three lots, but Sterngold's version was that the sale was subject to the approval of Sterngold's designer and that sample cuts were to be sent to Sterngold who would agree finally to the sale if the designer approved. Of course, since the Referee and Special Term accepted Trojan's version of this conversation, and the Appellate Division affirmed, we are bound by those holdings as to this issue of fact. Sterngold testified further that the sale on the part of Trojan was made contingent on price approval by someone at Trojan's office, which Ozdoba denied and which is not important since, obviously, Trojan, by sending on the contract, approved the price. Thus, the only substantial dispute between the parties as to the oral arrangements of July 10th was as to whether the sale was contingent on Whiting's later approval of samples — this was denied by Trojan, and the Referee found that there was no such condition of sale but that the three five-yard pieces were not samples for inspection but were partial deliveries against the contracts. We are bound by those findings.

As aforesaid, Whiting, on July 16th, six days after the written contracts had been sent and received, notified Trojan, orally and by letter, that it could not use two of the patterns, but was signing and sending to Trojan the signed contract for the other pattern, the letter expressing regret for any inconvenience. On July 20th, Trojan wrote a letter, in which it

replied to Whiting's letter of July 16th by saying that it (Trojan) would not accept the "cancellation" of the two patterns. That letter repeated Trojan's version of the oral arrangements, stated that the low price was based on Whiting taking the whole lot, and demanded that Whiting honor the contracts and pay the invoices.

There are really two questions here: first, whether Whiting made any binding agreement at all to purchase the three lots, and, second, if the first question be answered in the affirmative, whether Whiting bound itself to arbitrate in case of dispute. As to the first question, it seems clear that the facts as found and affirmed below establish, as of July 10, 1953, an agreement to buy and sell which was to be, and was, memorialized by written contracts sent out on the same day. That such was the arrangement is established not only by testimony as to the conversation at Whiting's office but by the fact that Whiting held these contracts for six days without returning them and, meanwhile, received invoices for some of the goods and received actual delivery of the three five-yard pieces which Whiting never did return, and that, even when writing the letter of July 16th, Whiting did not really deny having made a deal for the three lots but expressed its regret that it could not use two of them. Perhaps, we do not have to decide on this appeal whether or not these contracts would be, in a suit at law, unenforcible. This is not such a suit at law but an arbitration proceeding and it may be that a failure to comply with the Statute of Frauds would not help Whiting. However, if we assume that the Statute of Frauds is applicable, its provisions are satisfied here, since the Referee held, on sufficient evidence, that the three five-yard pieces were not samples sent for approval but were "part of the goods" accepted and received by the buyer (Personal Property Law, § 85). Of course, they were very small deliveries but they were billed as deliveries under the contracts.

The other question is as to whether there is sufficient proof here to justify the findings below that the parties agreed on arbitration. We think that finding is amply justified by the showing that Whiting retained, for several days, the contracts containing arbitration clauses, and that Whiting never, at any

time, objected to there being arbitration clauses and, in fact, signed one of the contracts containing an arbitration clause. From our own experience, we can almost take judicial notice that arbitration clauses are commonly used in the textile industry, and Sterngold testified that he was familiar with them. Cases like *Matter of Albrecht Chem. Co. (Anderson Trading Corp.)* (298 N. Y. 437) and *Matter of Tanenbaum Textile Co.* v. *Schlanger* (287 N. Y. 400) are not at all in point here since they involve situations where there was nothing to show an agreement to arbitrate but, rather, rejection of proposals for arbitration clauses. Here, the retention of the agreements containing arbitration clauses and the return, signed, of one of them was, we hold, sufficient evidence of an agreement on arbitration (see *Matter of Japan Cotton Trading Co.* v. *Farber,* 233 App. Div. 354, 355).

Appellant urges that arbitration cannot be ordered here since appellant never signed an agreement to arbitrate (except that it did sign one contract and Trojan refused to perform that contract without performance of the other two). Section 1449 of the Civil Practice Act is in rather odd form, as follows: "A contract to arbitrate a controversy thereafter arising between the parties must be in writing. Every submission to arbitrate an existing controversy is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent." The second sentence (*supra*) in plain language says that a submission to arbitration of an existing controversy is void unless in writing and signed. However, the first sentence, applicable here, says that a contract to arbitrate a controversy thereafter arising must be in writing, but nothing is said as to signature. In *Matter of Gantt (Hurtado & Cia.)* (297 N. Y. 433, 441) we avoided a flat statement that a contract to arbitrate future controversies need not be signed, but we did indicate that the writing required by that first sentence of section 1449 has the same meaning as the words "A written provision" in section 2 of title 9 of the United States Code which has no provision at all for signature. The language of section 1449 is plain enough in this connection and the only cases found in the appellate courts (*Matter of Japan Cotton Trading Co.* v. *Farber,*

233 App. Div. 354, *supra,* and *Matter of Exeter Mfg. Co.* v. *Marrus,* 254 App. Div. 496) seem to hold that the statute means what it says and that, while a contract to arbitrate future controversies must be in writing, it need not be signed so long as there is other proof that the parties actually agreed on it. This requirement of signatures for a submission of an existing dispute, but not for an agreement to arbitrate future controversies, stems from the common law. At common law, an agreement to submit future-arising disputes to arbitration was not enforcible at all (*Hurst* v. *Litchfield,* 39 N. Y. 377; *President of Delaware & Hudson Canal Co.* v. *Pennsylvania Coal Co.,* 50 N. Y. 250) while an agreement to submit an existing controversy to arbitration was, at common law, enforcible even without a writing unless the underlying controversy was such that any agreement having to do with it was governed by the Statute of Frauds (*French* v. *New,* 28 N. Y. 147).

We conclude that, on this record, there is no legal bar to the arbitration of this dispute.

The order should be affirmed, with costs.

FROESSEL, J. (dissenting). I dissent and vote to reverse. There was no discussion about arbitration at the time the so-called oral agreements were made. Therefore, the " Acknowledgments of Orders " containing an arbitration clause were not true confirmations or acknowledgments of the agreements but rather counteroffers adding a provision for arbitration. Only one of said counteroffers was accepted. I do not see how the signing of that one " Acknowledgment of Order " was an agreement to arbitrate two entirely separate and distinct agreements, nor how the retention of the latter for two or three days under the circumstances disclosed by this record authorizes us to hold that there was an agreement to arbitrate them.

LEWIS, Ch. J., CONWAY, DYE and FULD, JJ., concur with DESMOND, J.; FROESSEL, J., dissents in memorandum in which VAN VOORHIS, J., concurs.

Order affirmed.