■ In the Matter of the Arbitration between GARRETT CORPORATION, Respondent, and FRANK IX & SONS NEW YORK CORPORATION, Appellant.

Appeal from an order of the Supreme Court at Special Term, entered February 25, 1959, in New York County, which granted a motion by petitioner for an order to stay an arbitration proceeding and denied respondent's cross motion to compel said arbitration to proceed.

Order affirmed.

BREITEL, J. P. (dissenting). Between August 1, 1957 and September 10, 1957, the seller Ix, in 25 different shipments, delivered over 100,000 yards of textiles to Vulcan, the designated processor of the buyer, Garrett. The buyer now denies a sale or a written agreement to arbitrate. No contract for the sale or agreement to arbitrate was ever signed.

Before the shipments had been made, four contract forms had been sent in early July to the buyer and had been returned by the buyer's purchasing agent with a suggestion that the price terms should be reduced. The contracts aggregated about 785,000 yards at prices ranging from $.48 to $1.13 per yard. Following a conversation, which is not disputed, between high officers of the seller and the buyer, four identical contract forms were sent again, in August, by the seller to the buyer containing the same price terms. These were never returned and no objection was ever made to them.

With respect of each of the shipments, invoices were sent to the buyer — 25 of them — and they were never returned (except for two, with the letter of October 9, later discussed), nor was any timely or other objection ever made. The buyer's processor, Vulcan, retained the merchandise, paid the freight charges (for which it was reimbursed by the buyer) and, in each instance — by 15 separate letters — notified the buyer that the merchandise had been received.

During this period while shipments were being made, and for two months after the last delivery, the seller importuned the buyer in writing to return the

contracts signed and to pay invoices. In no instance was there ever a written reply to these letters or notices.

At least twice during the period from the end of July until the end of November the schedule of deliveries which had been arranged back in June of 1957 was changed to suit the buyer at its request. In each instance change-notices with respect to the contracts were sent to the buyer, were retained by it, and no objection was ever made to them.

Not until October 9, almost a month after the last delivery, did the buyer note an objection to the invoices and the deliveries. That episode is explained later.

The contract forms, which were received and retained without objection, contained a general arbitration clause, and it is under that provision that the seller has sought to compel arbitration. The buyer has resisted arbitration on the ground that no contract and no purchase was ever made.

On the documentary and objective (and therefore unchangeable) facts discussed thus far, the order of Special Term should be reversed as a matter of law, the buyer's motion to stay arbitration should be denied, and the seller's cross motion to compel arbitration should be granted.

The law is well settled, and the principle is clear and just, that where a person accepts a written agreement and acts upon it he is bound by it, although he may never have set his hand to the document (*Newburger* v. *American Sur. Co.*, 242 N. Y. 134, 143; cf. *Murray* v. *Cunard S. S. Co.*, 235 N. Y. 162; *Matter of Exeter Mfg. Co.* v. *Marrus*, 254 App. Div. 496; *Matter of Japan Cotton Trading Co.* v. *Farber*, 233 App. Div. 354).

Nor is it necessary that an agreement to arbitrate future disputes be subscribed. It is enough that it is in writing (Civ. Prac. Act, § 1449; *Matter of Helen Whiting, Inc.* [*Trojan Textile Corp.*], 307 N. Y. 360). This, too, is undisputed.

Beyond the documented and conceded facts, which compel the legal conclusion first discussed, there are other very interesting factual circumstances. As to some of these there is dispute, but the credible evidence is, nevertheless, preponderant that a sale was made, and that the contracts in writing, each including an arbitration clause, were accepted and adopted by the buyer. To the extent that Special Term found otherwise on the facts, its order should be reversed, if it were necessary, on the facts, as well as on the law.

These are the other factual circumstances.

The buyer and the seller had been doing business for a number of years, between 1954 and 1957, and the relationship was a very good one. In all past transactions, of which there were 16, the usual contract form of the seller was signed, either before delivery or shortly thereafter. In each instance it contained the seller's standard arbitration clause.

In the Spring of 1957 the buyer was negotiating for a contract with the United States Government to supply life rafts for the Navy. In order to perform readily under the contract, which it had every expectation of receiving, the buyer negotiated with the seller and with buyer's independent processor, and made every advance arrangement for quality and quantity of supplies, schedules of delivery, processing, and prices. Repeatedly, and there is no dispute about this, consummation of the interrelated transactions was held in abeyance because the negotiations with the government were not yet concluded, or, at least, were not made final by written contract.

Concededly, on July 2, 1957, the seller's officer and the buyer's officer had a telephone conversation in which it was understood that because of the delays in the government negotiations the sale of the textile merchandise would not be

advanced. So on this date both parties agree that there was no contract, no order, and that all expected to await the buyer's receipt of a contract from the government.

On July 8 there was a similar telephone conversation. This time, however, there is a contradiction as to its content. The seller's officer says he was told that the buyer had the government order and that the seller should go ahead. The buyer's officer says that he said they had no government order yet, and that, if the seller could wait no longer, it should release its looms, that is, cease to be ready to perform should the government order eventually come through. He admits, however, that he probably told the seller that he thought he had a contract with the government.

Of course, what actually was said in that telephone conversation one is never likely to know. It seems incredible that the buyer's officer should have said that it had an order from the government when in fact it did not. It seems even more incredible, however, that the seller's officer came away from the telephone conversation with the idea that it was not to go ahead and that it was to release its looms. For within one day the seller sent its contract forms to the buyer, and in due time proceeded to ship, in installments, over 100,000 yards of textiles. The least that one must infer is that on July 8 the seller was told, or was led to believe that it was told, to proceed, for it did proceed: the deliveries were made; the contract forms were sent; the invoices were sent; the processor accepted the merchandise; the processor notified the buyer; and all of this happened without objection or protest by the buyer.

Indeed, in late July, the buyer's purchasing agent instructed the processor to coat approximately 500 yards of the goods, that were yet to come in, on an experimental basis. The processor did this, shipped the coated goods to the buyer, and was apparently paid therefor. So testified the independent processor.

Not until October, 1957 did the buyer send a letter to the seller saying that there was no contract and that there was no order. The buyer's then officer makes no claim that before this he was not fully cognizant that the seller was going ahead. He describes the occasion for writing his letter thus: that he discovered for the first time that there had been this "barrage of documents", and he told his purchasing agent to put the buyer on record immediately to the effect that there was no contract and that there was no sale. To this letter there was a spirited and indignant response by the seller.

Shortly after the exchange of letters the buyer offered to buy the merchandise that had been delivered to the processor. The reason for this, buyer's then officer says, was that he recognized that the buyer had "a moral obligation". For reasons that do not clearly appear, the matter was never settled. What is known is that Air Cruisers, the particular division of the buyer interested in the government contract, was sold to another corporation; the buyer never obtained the government contract; and the buyer's then officer and then purchasing agent transferred their employment.

The foregoing are essentially the surrounding facts, additional to the unequivocal documents and the objective fact of the unrejected deliveries. There is still some other evidence. Thus, the buyer's then purchasing agent says that he telephoned the seller two or three times a week, talking about the invoices that had been received and the contract forms. But he was utterly unable to particularize the times or the content of these telephone conversations. Nor did he describe the seller's responses. Significantly, the buyer never committed itself in writing until October 9.

The buyer argues that the seller shipped the merchandise without order because it was anxious to secure the sale if the buyer received the government

contract. This — although there is no dispute that the buyer had always assured the seller that it would participate as a supplier if the buyer received the government contract. The seller, of course, argues that the buyer was anxious to be able to perform on the government contract if it received it and, therefore, was anxious to keep its supplier in line. Evidently the buyer had no similar problem with regard to the processor. Except on an experimental basis, the processor was never told to go ahead and coat the fabrics before the buyer received its government contract. The motivation and its resolution is the subject of speculation and it is unsatisfactory, as it always is, to try to read the interior of men's minds. The documentation, however, and the fact of deliveries made and received without objection are unalterable objective facts.

It is for these reasons that I dissent and vote to reverse the order, as a matter of law. Even if on July 8th there was no contract, what the parties did thereafter resulted, either as a matter of manifested intent or estoppel, in a sale under a written contract to arbitrate. Needless to repeat, it was not necessary that the buyer sign the contract forms. Nor is the view of Special Term acceptable that though there might have been a purchase, there was never an adoption of the written contract forms. On the undisputed objective facts, the conclusion is unavoidable that, as a matter of law, there was a sale and that the sale was made under the written agreement. And the buyer is estopped to contend otherwise — not only as a matter of "morals" as the buyer's officer believed, but also as a matter of law.

To whatever extent it is necessary, if it were necessary, to decide the issues of fact I would also reverse the order on the facts. There is nothing but vague and inconclusive description of the conversations among the persons involved subsequent to the telephone conversation of July 8. Even if the purchasing agent's alleged telephone conversations during August are considered, they provide but a scintilla of fact to create an issue and a palpably false one to boot. This is never sufficient (*Matter of Case,* 214 N. Y. 199, 203).

Accordingly, the order of Special Term should be reversed, the motion to stay arbitration denied, and the cross motion to compel arbitration granted, with costs to respondent-appellant.

M. M. Frank, Valente and Stevens, JJ., concur in decision; Breitel, J. P., dissents and votes to reverse in opinion, in which McNally, J., concurs.

Order unanimously affirmed, with $20 costs and disbursements to the petitioner-respondent. [16 Misc 2d 152.]

