In the Matter of JOSEPH MULLER COR-PORATION ZURICH, Petitioner,

v.

COMMONWEALTH PETROCHEMI-CALS, INC., Respondent.

No. 71 Civ. 3596.

United States District Court,
S. D. New York.

Nov. 30, 1971.

Peter G. Eikenberry, New York City, for petitioner.

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, for respondent, by Robert S. Stitt, Eric K. Copland, New York City, of counsel.

GURFEIN, District Judge.

This is a petition to compel arbitration brought by Joseph Muller Corporation Zurich, Switzerland, pursuant to 9 U.S.C. § 4. Petitioner seeks an order compelling respondent to submit to arbitration in accordance with a purported written arbitration provision agreed to by both parties and enforceable under 9 U.S.C. § 2. The jurisdiction of this Court, which requires an independent basis for jurisdiction (Metro Industrial Painting Corp. v. Terminal Construction Co., 287 F.2d 382, 384 (2 Cir.), cert. denied, 368 U.S. 817, 82 S.Ct. 31, 7 L.Ed.2d 24 (1961)), may be found in 28 U.S.C. § 1332(a) in that diversity of citizenship is present and the amount in question exceeds $10,000. Petitioner Joseph Muller Corporation is incorporated under the laws of the Canton of Zurich, Switzerland, and is, therefore, a citizen of a foreign state within the meaning of 28 U.S.C. § 1332(a) (2). Chemical Transportation Corp. v. Metropolitan Petroleum Corp., 246 F.Supp. 563 (S.D. N.Y.1964). Respondent Commonwealth is a corporation organized under the laws of the Commonwealth of Puerto Rico with an office in San Juan. As such respondent is a "citizen of a State" within the meaning of 28 U.S.C. § 1332(a) (2). See 28 U.S.C. § 1332(d); Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 87 (2 Cir. 1961), cert. denied, Dawson v. Lummus Co., 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962). The award which may result from arbitration of the controversy involves demurrage charges and other claims in excess of $10,000. The demurrage charges alone amount to $2,600 per day for at least 4 days. Jurisdiction, therefore, lies.

The respondent contends that the petition to compel arbitration should not be granted for two reasons: (1) that there never was an agreement to arbitrate by the parties; and (2) that, even if there was an agreement, it is invalid and unenforceable because there was fraud in the inducement of the contract. These contentions cannot be considered without a recital of the documents exchanged between the parties.

Early in 1971, the parties entered into negotiations for the sale and delivery by the petitioner of propylene to the respondent at its storage facilities in Puerto Rico. Propylene is a flammable gas which is shipped in liquid form under pressure or refrigeration. Respondent originally requested that the propylene be discharged in Puerto Rico at temperatures approximating atmospheric conditions in order to facilitate its unloading. Petitioner was unable to charter any

ships with a capacity to unload at atmospheric temperature. Extensive additional negotiations were then carried on to determine at which temperature the propylene would be shipped and at which temperature it would be unloaded. Respondent asserted that the unloading temperature was crucial because the cooled gas might cause extensive damage to respondent's facilities if it were unloaded in too cold a condition. The petitioner, thereafter, suggested shipping the propylene on a vessel which would enable the propylene to be carried at a colder temperature and heated to the ambient temperature in Puerto Rico when it was unloaded under pressure. It was known that the heating and pressurizing of the propylene for discharge in Puerto Rico would require some time and, accordingly, the question arose as to who would pay the demurrage charges for the delay incident to such unloading.

Petitioner made its initial offer for the sale of propylene in a letter dated January 4, 1971, to which respondent replied on February 8, 1971, accepting petitioner's terms and adding the qualification that the propylene would be delivered to Guayanilla from the ship's tanks "at atmospheric temperature more or less." On February 22, petitioner replied that only semi-refrigerated ships were available for this traffic and asked the respondent to notify it of the "minimum temperature at which you are able to receive cargo and maximum pressure." To this the respondent replied by telex on the same day "can receive propylene at ambient temperature only (90 degrees F) maximum pressure 250 PSI." Respondent added that its offer to purchase would terminate if the petitioner failed to confirm respondent's condition by 5 p. m. that day. Petitioner, by telex received at 3:30 p. m. that day, confirmed its conclusion of a freight contract with a shipowner for 5 shipments of 2,200 metric tons of propylene and stated

that the ships would transport the material semi-refrigerated and would heat up the material to discharge under pressure. The petitioner added "will pass on your temperature/pressure to shipowner tomorrow." There was, in fact, a further exchange concerning the temperature and pressure, but it presumably did not succeed in establishing any clear statement of those requirements.

Thereafter, on March 8 petitioner by telex nominated the vessel FROSTFONN to transport the first shipment of propylene and informed the respondent that "shipowner estimates transfer commencing at 60 degrees F and lowering promptly to 32 degrees F against 220–250 PSIG will require 24 hours maximum." Ultimately the FROSTFONN arrived in Puerto Rico on April 15 and began the next day to discharge propylene in alleged violation of the respondent's discharge requirements. It is unnecessary to advert to the arguments and counter-arguments with respect to an alleged misunderstanding between the parties of the temperature and pressure requirements.

On March 2, 1971, before the FROSTFONN had sailed, the petitioner sent to the respondent a copy of its form entitled "INSTRUCTIONS HOW TO OPEN LETTER OF CREDIT IN FAVOUR OF JOSEPH MUELLER CORPORATION ZUERICH" and requested the respondent to open a letter of credit in favor of the petitioner in the amount of $140,700 in accordance with the enclosed instructions. These "Instructions," in addition to containing terms dealing with the specifications of the propylene, documentation and payment, also contained "Special Instructions." These "Special Instructions" included: (1) an arbitration clause and (2) a statement that, in the absence of a signed contract of sale and purchase between the parties, the letter of credit constitutes the entire contract. The arbitration clause therein contained is set forth in the margin.[1]

---

1. "If at any time there shall arise any disputes, controversies, or claims respecting the breach or performance of this contract or any of the provisions or any

matter pertaining to the construction or interpretation thereof, or any matters pertaining to valuations, price changes, and any and all other matters not neces-

On March 5 the petitioner submitted to the respondent a proposed contract for the sale and delivery of propylene which contained the same arbitration clause *in haec verba*. The respondent refused to execute the agreement on the ground that it failed to include the understanding concerning respondent's discharge requirements for the propylene. No question was raised or discussed about the arbitration clause.

In the meantime, by telex of March 12, 1971 the respondent appears to have accepted the "Instructions" as follows:

"The content of the Instructions on How to Open a Letter of Credit in Favor of Joseph Mueller Corporation-Zurich are acceptable to us. However, by no means as previously explained does it represent the complete agreement between us."

Thus, there was no rejection of the arbitration clause as such. This apparently was the view of the petitioner who, replying on March 19 to the above, wrote:

"From this telex we see that you accept our form entitled 'Instructions

how to open letter of credit' * * * sent to you attached to our letter of March 2, 1971. Please note that when and if we receive your Letter of Credit it shall be the complete agreement between the parties for the first shipment and the only binding document between our two companies, except arbitration to which you agreed in your above telex, unless you sign the written Contract No. 13.786 submitted to you and until such signed Contract is in our hands."

The respondent did open a letter of credit at the First National City Bank in favor of the respondent for $155,000, which did not, however, include the provision for arbitration or the "complete agreement" clause. Petitioner's New York counsel on March 17 wrote to respondent stating:

"It is my understanding that the letter of credit will be revised so as to conform to the terms set forth in 'Instructions How to Open a Letter of Credit in Favour of Joseph Mueller Corporation Zuerich' previously delivered to

---

sarily limited to the foregoing, which cannot be amicably settled or disposed of by the parties intra se, same may then, on the request of any of the contracting parties, be resolved by arbitration, which shall be the exclusive remedy for the disposition and determination of any and all such matters to the exclusion of court proceedings, and shall be processed as follows:
(i) The party making the claim or demand shall notify the other by registered airmail, return receipt requested, after all efforts have been made to amicably resolve the issue, demanding arbitration.
(ii) Within no later than four weeks following the transmittal of such letter, which is to be sent registered airmail return receipt requested, each party shall nominate one arbitrator to represent each other's respective interests.
(iii) If either of the parties fails to nominate an arbitrator within the allotted period of time as aforementioned, or if the two arbitrators nominated or selected by or for the parties shall fail or refuse to agree upon the person to act as the chairman and/or umpire, then the president and/or vice-president of the American Arbitration Association in New York will, upon the application of either of the sub-

ject parties, appoint the non-nominated arbitrator or chairman or both, as the case may be, provided that such arbitrator or chairman and/or umpire or both, as the case may be, so appointed shall be a person or persons actively and commercially identified with the Propylene industry, and have all of the necessary chemical experience and background to endow them with such experience in the fields of chemistry and foreign commerce to enable them to satisfactorily serve in such capacity. In case of any dispute regarding the qualification and/or experience of an appointed arbitrator the determination of the experience of such arbitrator shall be made by the arbitrational panel of the American Arbitration Association, New York, and such determination shall be binding on both parties. The rules and regulations concerning the entire arbitration except as indicated above, shall be governed by the rules and regulations of the American Arbitration Association and the arbitration shall be conducted in New York, New York.
(iv) If a verdict is obtained by either party, this verdict can be enforced in whatever country and in accordance with whatever law the winning party wants to have it enforced."

you, with the exception that you do not accept the first paragraph in the section captioned 'Special Instructions,' and while you accept the balance of the 'Special Instructions' sections, you will not set this forth in the letter of credit." [2]

Included in the "balance of the 'Special Instructions'" was the arbitration clause previously mentioned.

Respondent replied, on March 22, that the sale agreement was in the hands of its legal department for review and redrafting. The letter stated:

"We again stipulate that our current agreement, in the absence of better documentation, is based on the exchange of correspondence and cables which indicates the required performance of both parties. As we have previously indicated, the instructions for how to handle a letter of credit are acceptable to us, however, by no means constitute the entire agreement between us."

It did not rebut the statement that the "balance of the 'Special Instructions'" was accepted.

■ The petitioner now seeks to compel arbitration under Section Four of the Federal Arbitration Act. The requirement of "commerce" contained in that Act, 9 U.S.C. §§ 1–2, is met since the transaction involved a shipment of propylene from Europe to Puerto Rico. See Caribbean S.S. Co. v. La Societe Navale Caennaise, 140 F.Supp. 16, 21–22 (E.D.Va.), aff'd Reynolds Jamaica Mines v. La Societe Navale Caennaise, 239 F.2d 689 (4 Cir. 1956).

■ For a petitioner to succeed in compelling arbitration under the Federal Arbitration Act, 9 U.S.C. § 4, he must also show a "written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction" (9 U.S.C. § 2). Metro Industrial Painting Corp. v. Terminal Construction Co., *supra*, 287 F.2d at 384. This is true because the order sought under Section 4 is dependent upon a "refusal * * * to arbitrate under a written agreement for arbitration." The issue, therefore, is whether in the exchange of correspondence recited above there emerged a "written agreement for arbitration" of a kind sufficient to satisfy the requirements of the statute.

■ At the threshold it should be noted that federal law, composed of generally accepted principles of contract law, controls the validity of an "agreement for arbitration," under the Federal Arbitration Act. Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402, 404–409 (2 Cir. 1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, cert. dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); see Fisser v. International Bank, 282 F.2d 231, 233 (2 Cir. 1960). A motion to compel arbitration under Section Four is simply a request for an order compelling specific performance of part of a contract. Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978, 986–987 (2 Cir. 1942). Since a court should not exercise such powers except "on the basis of a fully informed judgment as to all the circumstances" (ibid.), the Act has provided that the court must be "satisfied that the making of the agreement for arbitration * * * is not in issue" (§ 4); otherwise there must be a trial on that issue. That test, however, cannot mean that a trial is necessary in every case where the court finds preliminarily that such an issue has been tendered. If, upon the papers submitted and after a hearing thereon, there emerg-

---

**2.** The first paragraph of these Special Instructions reads:

"As long as no signed contract of sale and purchase is in existence between beneficiaries as seller and Commonwealth Petrochemicals Inc. as buyer before this Letter of Credit is cashed by the beneficiaries, it is mutually agreed that this present Letter of Credit constitutes the entire contract of sale and purchase of the material named therein."

es only a question of law on which the court is "fully informed," relief may be granted without a trial. After all, such an issue would never go to a jury in any case. And we must bear in mind that the fundamental purpose of the Federal Arbitration Act is to relieve the parties from expensive litigation and "to help ease the current congestion of court calendars." Robert Lawrence Co. v. Devonshire Fabrics, Inc., *supra*, 271 F.2d at 410.

In the case at bar, a contract for the sale of goods arose from the offer of the respondent to buy the propylene and the act of the petitioner in shipping it. 1 Corbin on Contracts § 77 (1963); U.C.C. 2–206(1) (b).[3] See also U.C.C. 2–207 (3)[4]; Bauer International Corp. v. Eastern Township Produce, Ltd., 4 U.C.C. R.S. 735 (Sup.Ct.N.Y.Co.1967), aff'd, 29 A.D.2d 738, 288 N.Y.S.2d 434 (1st Dept. 1968).

Both parties accordingly became bound to a contract, but it was never an integrated written document containing all the terms of the transaction.[5] A written integrated contract had been tendered by the petitioner but not accepted by the respondent. On the other hand, there was clearly an intent on the part of both parties to accept the provision for arbitration contained in the "Special Instructions." The unacceptability of that provision was never raised in the negotiations. When the counter-offer of March 22 by the respondent stated: "We again stipulate that our current agreement, in the absence of better documentation, is based on the exchange of correspondence and cables which indicates the required performance of both parties," the respondent was adopting as its counter-offer the portions of the correspondence already received, including the arbitration clause in the "Special Instructions."[6] By shipping the propylene, the petitioner accepted this counter-offer, resulting in a valid contract.[7]

The only question that remains is whether the statute in requiring "a written provision in * * * a contract evidencing a transaction involving commerce" is limited to a contract completely integrated in a single written agreement. If that is what is meant, arbitration may not be compelled, for the contract here is not a single integrated written agreement.

There seems to be a dearth of federal authority on the question of whether a written offer accepted by performance or a contract formed by correspondence

---

3. "2–206. Offer and Acceptance in Formation of Contract

    (1) Unless otherwise unambiguously indicated by the language or circumstances * * *

    (b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods, * * *."

4. "(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act."

5. Any previous understanding that the parties would not be bound before the execu-

tion of a formal contract was negated by the parties' subsequent conduct, *i. e.*, performance. See 1 Corbin on Contracts § 30, at nn. 45–46 (1963).

6. The respondent's telex of March 12, previously quoted in the text, could also be seen as a counter-offer incorporating the arbitration clause.

7. Alternatively, the petitioner's letter of March 2 with the enclosed "Instructions" can be seen as an offer to sell, which was accepted by the respondent's telex of March 12 or his letter of March 22, even though the respondent indicated therein some changes in terms. See U.C.C. 2–207(1). Regardless of whether those different terms became part of a valid contract, the arbitration clause did. Furthermore, even under the theory developed in the text, the Court wishes to stress that it makes no finding regarding the contents of the contract, other than the inclusion of the arbitration clause.

is "a contract evidencing a transaction" within the meaning of the Federal Arbitration Act.

In Universal Oil Products Co. v. S. C. M. Corp., 313 F.Supp. 905 (D.Conn. 1970), Judge Timbers compelled arbitration under a *contract formed by the seller's delivery pursuant to a counter-offer consisting of the buyer's purchase order* form which contained an arbitration provision. Judge Timbers cited no authority for this conclusion.

■ It has been said by an eminent authority that the insertion of "evidencing a transaction" into the language of the bill, which had previously read "in any maritime transaction or contract or transaction involving commerce," was merely "*to improve the language of the act and not to effect a substantive change.*" Metro Industrial Painting Corp. v. Terminal Construction Co., *supra*, 287 F.2d at 387 n. 2 (Lumbard, J., concurring). If we do not assign a literal emphasis to "evidencing a transaction," we may conclude that if there is a written provision for arbitration coupled with a contract between the parties, albeit a unilateral contract or one arising from correspondence, that is enough to satisfy the Federal Arbitration Act.[8]

In Fisser v. International Bank, *supra*, the Court held that "[o]rdinary contract principles determine who is bound by such written provisions and of course parties can become contractually bound

absent their signatures." The Court gave a number of illustrations of how a party may become bound by a written arbitration provision without signing it, "limited only by generally operative principles of contract law" 282 F.2d at 233 and n. 6. I take the broad meaning of this to be that no single integrated agreement is required to the exclusion of other binding events under the generally operative principles of contract law. This result is in accord with the policy of the Act. It was intended to create a type of remedy. The single inquiry is whether the respondent agreed with the petitioner to pursue that remedy and whether it is memorialized in written words. Even though the respondent may not have signed its name to a particular paper containing the arbitration provision, if there was agreement to its terms, the respondent is nevertheless bound.[9]

State law, while not controlling on this point, is nevertheless instructive. New York's C.P.L.R. § 7501 requires a "written agreement" to arbitrate.[10] This, like the Federal Arbitration Act, has long been held not to require a signing. Helen Whiting, Inc. v. Trojan Textile Corp., 307 N.Y. 360, 121 N.E.2d 367 (1954). And in New York it has been held explicitly that the agreement to arbitrate need not be set out in one document (Hutchinson Roofing & Sheet Metal Co. v. IBM Corp., 237 N.Y.S.2d 582 (Sup. Ct., Westchester Co. 1963)) and that the offer to arbitrate can be accepted orally or by conduct (In re American News

8. Judge Canella may have been differently inclined in Superior Shipping Co. v. Tacoma Oriental Line, Inc., 274 F.Supp. 25 (S.D.N.Y.1967), although he did not discuss the point. He cited no case in point, citing only Fisser v. International Bank, *supra*, for a general proposition.

9. See also Tepper Realty Co. v. Mosaic Tile Co., 259 F.Supp. 688, 691 (S.D. N.Y.1966) in which Judge MacMahon wrote:
   "In the face of the complaint and the express provisions of the written contracts, plaintiffs' contention that there is no arbitration agreement simply because the parties to the agreements did not choose to express an arbitration clause in

the body of their contracts or resort to the rubric of incorporating the specifications by express reference is untenable. The question is not whether the parties, like the scrivener of old, followed some talismanic formula, but whether they manifested a mutual intent to arbitrate disputes arising out of the contracts, and *it is plain on the immutable facts that they did.*"

10. The Court of Appeals for this Circuit has intimated that the "minor language differences" between the New York and federal statutes are not, in this respect, important. Lummus Co. v. Commonwealth Oil Refining Co., *supra*.

Co., 130 N.Y.S.2d 554 (Sup.Ct., N.Y.Co. 1954)).

In essence, the decision of whether a single integrated contract should be required involves a balancing of the desirability of certainty and uniformity, on the one hand, against the policies of enforcing the parties' intent and of fostering submission to arbitration in accordance with the purposes of the Act. The latter side of the balance appears the more weighty. Requiring a single integrated contract, moreover:

"would have the effect either of eliminating as a practical matter arbitration provisions from numerous contracts which are entered into daily or of upsetting routine and ordinary business practices whereby contracts are made by accepting purchase orders, by brokers' notes, by performance, or even by silent assent. These conditions apply generally to the field of contracts and, although some problems arise, they are not of sufficient weight to urge a different disposition of contracts to arbitrate."[11]

Accordingly, I hold that the arbitration provision, as set out in the "Special Instructions," was agreed upon and is binding upon the parties.

Once it is held that the written arbitration provision is binding, then the question of venue must be resolved against the respondent. The arbitration clause specifically provides for arbitration in New York and that is enough to confer venue on the Court. Farr & Co. v. Cia. Intercontinental De Navegacion De Cuba, 243 F.2d 342, 346 (2 Cir. 1957); Lawn v. Franklin, 328 F.Supp. 791, 793–794 (S.D.N.Y.1971).

Finally, the respondent claims that there was fraud in the inducement of the contract in that the petitioner fraudulently concealed the fact that the ships chartered for the delivery of the propylene did not have sufficient unloading capacity. There is no separate claim that the arbitration provision was induced by fraud. Under these circumstances the Supreme Court has said:

"If the claim is fraud in the inducement of the arbitration clause itself— an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403–404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967).

The issue of fraud in the inducement must, therefore, be left to the arbitrators.

The motion to compel arbitration is granted.

Settle order on notice.

---

11. 17 Annual Report of the New York Judicial Council 228 (1951), referring to the inadvisability of requiring agreements to arbitrate to be signed.