Woody ALLEN, Plaintiff,

v.

NATIONAL VIDEO, INC., Ron Smith, d/b/a Ron Smith Celebrity Look-Alikes, and Phil Boroff, Defendants.

No. 84 Civ. 2764 (CBM).

United States District Court, S.D. New York.

May 16, 1985.

---

Bornstein & Laufer by Jacob Laufer, New York City, for plaintiff.

Lester Schwab Katz & Dwyer by Patrick A. Lyons, Thomas A. Catalano, New York City, for defendant National Video.

Frankfurt Garbus Klein & Selz by Richard Kurnit, New York City, N.Y., for defendants Smith & Boroff.

## OPINION

MOTLEY, Chief Judge.

This case arises because plaintiff, to paraphrase Groucho Marx, wouldn't belong to any video club that would have him as a member. More precisely, plaintiff sues over an advertisement for defendant National Video (National) in which defendant Boroff, allegedly masquarading as plaintiff, portrays a satisfied holder of National's movie rental V.I.P. Card. Plaintiff asserts that the advertisement appropriates his face and implies his endorsement, and that it therefore violates his statutory right to privacy, his right to publicity, and the federal Lanham Act's prohibition of misleading advertising. Plaintiff, basing jurisdiction on diversity of citizenship, seeks an injunction against Boroff and defendant Smith, Boroff's agent, and damages against all defendants.[1]

Defendants, while conceding that Boroff looks remarkably like plaintiff, deny that the advertisement appropriates plaintiff's likeness or that it poses a likelihood of consumer confusion. In addition, defendants Smith and Boroff seek indemnity under an alleged contract with defendant National, and charge that National violated Boroff's own privacy rights and breached the contract in using Boroff's picture without a required disclaimer and by placing it in media not authorized by the contract. National disputes that it ever entered into the alleged contract, and claims instead to have a general release from Boroff.

This matter is before the court on cross motions for summary judgment on the above claims, and on the motions of plaintiff and defendant National to amend their pleadings. For the reasons set forth below, plaintiff's motion for summary judgment is granted; defendants' motions for summary judgment against plaintiff are denied; defendants Smith and Boroff's motion for summary judgment against defendant National is granted in part and denied in part. The motions of plaintiff and defendant National to amend their pleadings are granted.

## FACTS

■ The following facts are not in dispute. Plaintiff Woody Allen is a film director, writer, actor, and comedian. Among the films plaintiff has directed are "Annie Hall," which won several Academy Awards, "Manhattan," "Bananas," "Sleeper," "Broadway Danny Rose," and, most recently, "The Purple Rose of Cairo."[2] In addition to being a critically successful artist, plaintiff has for more than 15 years been a major international celebrity. Although he has not often lent his name to commercial endeavors other than his own projects, plaintiff's many years in show business have made his name and his face familiar to millions of people. This familiarity, and plaintiff's reputation for artistic integrity, have significant, exploitable, commercial value.

The present action arises from an advertisement, placed by National to promote its nationally franchised video rental chain, containing a photograph of defendant Boroff taken on September 2, 1983. The photograph portrays a customer in a National Video store, an individual in his forties, with a high forehead, tousled hair, and heavy black glasses. The customer's elbow is on the counter, and his face, bearing an expression at once quizzical and somewhat smug, is leaning on his hand. It is not disputed that, in general, the physical

---

1. Plaintiff has withdrawn his request for injunctive relief against defendant National pursuant to a stipulation entered into on May 1, 1984 under which National has turned over all of the alleged offending materials to plaintiff. Plaintiff continues to seek damages against National, but has not moved for summary judgment on this question.

2. Although the court must deem to be admitted all uncontroverted statements of fact contained in a party's statement pursuant to Local Rule 3(g), the court may also take judicial notice of obvious factual errors. Contrary to plaintiff's assertion in paragraph 32 of his 3(g) statement, the film "Play it Again, Sam," although written by Allen, was directed by Herbert Ross.

features and pose are characteristic of plaintiff.

The staging of the photograph also evokes associations with plaintiff. Sitting on the counter are videotape cassettes of "Annie Hall" and "Bananas," two of plaintiff's best known films, as well as "Casablanca" and "The Maltese Falcon." The latter two are Humphrey Bogart films of the 1940's associated with plaintiff primarily because of his play and film "Play It Again, Sam," in which the spirit of Bogart appears to the character played by Allen and offers him romantic advice. In addition, the title "Play It Again, Sam" is a famous, although inaccurate, quotation from "Casablanca."

The individual in the advertisement is holding up a National Video V.I.P. Card, which apparently entitles the bearer to favorable terms on movie rentals. The woman behind the counter is smiling at the customer and appears to be gasping in exaggerated excitement at the presence of a celebrity.

The photograph was used in an advertisement which appeared in the March 1984 issue of "Video Review," a magazine published in New York and distributed in the Southern District, and in the April 1984 issue of "Take One," an in-house publication which National distributes to its franchisees across the country. The headline on the advertisement reads "Become a V.I.P. at National Video. We'll Make You Feel Like a Star." The copy goes on to explain that holders of the V.I.P. card receive "hassle-free movie renting" and "special savings" and concludes that "you don't need a famous face to be treated to some pretty famous service."

The same photograph and headline were also used on countercards distributed to National's franchisees. Although the advertisement that ran in "Video Review" contained a disclaimer in small print reading "Celebrity double provided by Ron Smith's Celebrity Look-Alike's, Los Angeles, Calif.," no such disclaimer appeared in the other versions of the advertisement.

None of the defendants deny that the advertisements in question were designed, placed, and authorized by defendant National, that defendant Boroff was selected and posed as he was to capitalize on his resemblance to plaintiff and to attract the attention of movie watchers, that defendants Boroff and Smith were aware of this purpose in agreeing to supply Boroff's services, and that in fact Smith and Boroff have on other occasions offered the services of Boroff, a Los Angeles-based actor and director, as a look-alike for plaintiff. Moreover, defendants do not dispute that the photograph in question was used for commercial purposes, and that plaintiff did not give his consent to the use of the photograph.

Plaintiff maintains that these undisputed facts require the court to enter summary judgment for him on his right to privacy, right of publicity, and Lanham Act claims. He urges the court to find, as a matter of law, that defendants used his picture or portrait for commercial purposes without his permission, and that the advertisements were materially misleading and likely to result in consumer confusion as to his endorsement of National's services.

Defendants insist that other disputed facts require denial of plaintiff's motion. Although defendants concede that they sought to evoke by reference plaintiff's general persona, they strenuously deny that they intended to imply that the person in the photograph was actually plaintiff or that plaintiff endorsed National. Defendants offer their own interpretation of the advertisement to support their assertion that the photograph does not depict plaintiff. According to defendants, the idea of the advertisement is that even people who are *not* stars are *treated* like stars at National Video. They insist that the advertisement depicts a "Woody Allen fan," so dedicated that he has adopted his idol's appearance and mannerisms, who is able to live out his fantasy by receiving star treatment at National Video. The knowing viewer is supposed to be amused that the counter person actually believes that the customer is Woody Allen.

Defendants urge that this interpretation cannot be rejected as a matter of law, and that if defendant Boroff merely appeared as someone who looks like Woody Allen, but not as Woody Allen himself, then plaintiff's rights were not violated. Defendants further seek summary judgment against plaintiff on the basis that plaintiff has offered no actual evidence that anyone was actually deceived into thinking that the photograph was of him.[3] In addition, defendants Smith and Boroff seek summary judgment on the basis that they did not "use" the picture in New York, as required under the privacy statute, because the photo session took place in Oregon and they had no control over the design of the advertisement or its placement. Smith and Boroff further urge that they never misrepresented Boroff as plaintiff, that they had insisted that National include a disclaimer in all advertisements using the photo, and that they are therefore guilty of no wrongful conduct and cannot be held liable for the misdeeds of National.

Plaintiff rejects defendants' explanation of the advertisement as fanciful and asserts that since all defendants knowingly participated in creating a photograph that amounts to a portrait of plaintiff to be used for advertising in a national magazine, they are all jointly and severally liable for violating plaintiff's rights.

In addition to the issues outlined above, defendants Smith and Boroff seek indemnity from defendant National, which itself contests the form and content of its contract with Smith and Boroff. It is not disputed that in preparation for the photo session in Oregon, Smith and Boroff sent to National a printed form contract which, *inter alia,* permitted the photographs produced to be used "one or two times" in "Video Review" magazine, prohibited National from representing that Boroff was really Woody Allen, required a disclaimer such as was used in one of the advertisements, and bound National to "forever indemnify and hold harmless and compensate completely" Smith and Boroff for any civil liability resulting from the use of the lookalike's picture.

This contract was delivered to National with defendant Smith's signature, and a blank space for National's representative to sign. It is not disputed that no one ever signed the contract for National. Moreover, National insists that its president, Ron Berger, was unhappy with the indemnification terms, and instructed National's staff designer to work out an oral contract simply to pay Smith and Boroff $2,000 for a one day photo session, with no other strings attached. It is not disputed, however, that this dissatisfaction was never specifically conveyed to Smith and Boroff, and that the written contract was never specifically disavowed; the parties simply proceeded with the photo session.

Smith and Boroff maintain that National adopted the written contract through its performance of the terms and its failure specifically to reject it, and that National should therefore be required to indemnify them for any liability in this case. Further, Smith and Boroff insist that National breached the contract by failing to include a disclaimer in some versions of the advertisement, and by using the photograph in media not authorized by the contract, and that these unauthorized uses of Boroff's photograph for commercial purposes violate Boroff's privacy rights under New York law.

National maintains that only an oral agreement, established in telephone conversations and in person at the photo session, governs the relationship of the parties. Al-

---

**3.** At oral argument on the motions now before the court, plaintiff offered the affidavit of John S. Bartolomeo, a marketing researcher retained by plaintiff, summarizing the results of a survey commissioned by plaintiff. The survey is alleged to prove that many people actually mistook the photograph in the National advertisement to be one of Woody Allen. Defendants object to the last minute submission of this survey and criticize the survey's design and methodology. Since the parties have not had an adequate opportunity to address this issue and since the court shares some of defendants' concerns, the court declines to rely on this survey in disposing of the instant motions.

though National does not dispute that it knew that a disclaimer had to be included in all uses of the advertisement, it maintains that an invoice sent by Smith and Boroff with the contract and bearing the words "MODEL RELEASE NOT VALID UNTIL THIS INVOICE IS PAID" operated as a general model release once the $2,000 was paid, defeating Smith and Boroff's contractual claims. At least, argues National, material issues of fact exist regarding the contract which necessitate the denial of summary judgment to Smith and Boroff.

DISCUSSION

### Privacy and Publicity Claims

Plaintiff's right to privacy claim, upon which the parties have focused in this litigation, is based on sections 50 and 51 of the New York Civil Rights Law. These narrowly drawn provisions were enacted in the early years of the century when recognition of the novel right was controversial. Although the court concludes that a more appropriate remedy for plaintiff is provided by the Lanham Act, it includes the following discussion for its value in framing the unusual questions presented in this case.

■ The beginning of modern privacy law is generally charted from the publication of the famous Warren and Bradeis article, *The Right to Privacy*, 4 Harv.L. Rev. 193 (1890). Although most states, in the decades since, have recognized at least four different categories of invasion of privacy, see Restatement (Second) of Torts, section 652A (1977), New York has never recognized the right to privacy as part of its common law. *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 439–40, 434 N.E.2d 1319, 449 N.Y.S.2d 941, 943 (1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 994 (1983).

*Arrington* reaffirms the rule first established in *Roberson v. Rochester Folding Box Co.*, 171 N.Y. 538, 64 N.E. 442 (1902). The New York Court of Appeals therein rejected an argument, based on the Warren and Brandeis article, that New York should recognize the branch of privacy law which has come to be known as misappropriation

of another's name or likeness. Plaintiff Roberson sought to recover for the humiliation she felt when she discovered that some 25,000 copies of her portrait had been distributed throughout the country without her consent as part of an advertisement for flour. The court held that no precedent supported plaintiff's argument, that recognition of such a common law right would result in endless litigation, and that only the legislature could create this new right. *Id.* at 543–45, 64 N.E. at 443.

In response to public outcry over the outcome of *Roberson,* the New York legislature passed sections 50 and 51 of the Civil Rights Law in 1903. In its present form the statute provides that

A person, firm or corporation that uses for advertising purposes, or for purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, is guilty of a misdemeanor.

N.Y.Civ. Rights Law section 50 (McKinney 1976). Section 51 provides in addition that

Any person whose name, portrait or picture is used within the state for advertising purposes or for purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if defendant shall have knowingly used such person's name, portrait or picture in such a manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages. . . .

*Id.*

■ The right to privacy recognized by the Civil Rights law has been strictly construed, both because it is in derogation of New York common law, *Shields v. Gross,* 58 N.Y.2d 338, 448 N.E.2d 108, 461 N.Y. S.2d 254, 257 (1983), and because of poten-

tial conflict with the First Amendment, particularly where public figures are involved. *Ann-Margaret v. High Society Magazine, Inc.*, 498 F.Supp. 401, 404 (S.D.N.Y.1980). To make out a violation, a plaintiff must satisfy three distinct elements: 1) use of his or her name, portrait, or picture, 2) for commercial or trade purposes, 3) without written permission. Merely suggesting certain characteristics of the plaintiff, without literally using his or her name, portrait, or picture, is not actionable under the statute. *See, e.g., Wojtowicz v. Delacorte Press*, 43 N.Y.2d 858, 374 N.E.2d 129, 403 N.Y.S.2d 218 (1978) (identifiable description of plaintiff in dramatization of true story, without showing her face or using her real name, did not violate statute); *Lombardo v. Doyle Dane & Birnbach*, 58 A.D.2d 620, 396 N.Y.S.2d 661 (2d Dep't 1977) (recognizable depiction in commercial of plaintiff's style of conducting "Auld Lang Syne" in New Year's Eve setting held not actionable when plaintiff's name not used and impersonator did not resemble plaintiff). Plaintiff here must therefore demonstrate, *inter alia*, that the advertisement in question appropriates his "portrait or picture."

In addition to the statutory right to privacy, plaintiff in this case argues that defendants have violated his "right of publicity," an analogous right recognized in the common law of many jurisdictions. Indeed, until recently, some federal courts assumed that the New York courts would recognize such a common law right independent of that protected by the Civil Rights Law. *See, e.g., Lerman v. Flynt Dist. Co., Inc.*, 745 F.2d 123, 133–34 (2d Cir.1984); *Ali v. Playgirl*, 447 F.Supp. 723, 728 (S.D.N.Y.1978). The elements of the cause of action were deemed to be essentially the same as those provided in the privacy statute, with the additional requirement that the plaintiff have developed a property interest with a monetary value in his or her name or face. *Lerman*, 745 F.2d at 134. Unlike the Civil Rights Law provision, which is primarily designed to compensate for the hurt feelings of private people who find their identities usurped for another's commercial gain, the right of

publicity protects this property interest of the celebrity in his or her public identity. *Brinkley v. Casablancas*, 80 A.D.2d 428, 438 N.Y.S.2d 1004, 1011 (1st Dep't 1981). It is primarily this interest which Woody Allen seeks to vindicate in the case at bar.

■ The New York Court of Appeals, however, recently has held that no separate common law cause of action to vindicate the right of publicity exists in New York. *Stephano v. News Group Publications, Inc.*, 64 N.Y.2d 174, 485 N.Y.S.2d 220, 474 N.E.2d 580 (1984) The court held, in essence, that the "right of publicity" was merely a misnomer for the privacy interest protected by the Civil Rights Law, as applied to public figures.

> By its terms, the statute applies to *any* use of a person's picture or portrait for advertising or trade purposes whenever the defendant has not obtained the person's written consent to do so.... Since the "right of publicity" is encompassed under the Civil Rights Law as an aspect of the right of privacy, which, as noted, is exclusively statutory in this state, the plaintiff cannot claim an independent common law right of publicity.

485 N.Y.S.2d at 224, 474 N.E.2d 580.

■ In view of the Court of Appeals' unambiguous holding in *Stephano*, plaintiff moves to amend his complaint to delete references to the common law as a source for the right of publicity. Plaintiff observes that the elements of his cause of action are unchanged, and that all of his theories are based on the same series of transactions and occurrences with which all parties are fully familiar. Defendants make no opposition to this motion, and the court grants it pursuant to the liberal amendment provisions of Fed.R.Civ.P. 15(a).

This court must also follow *Stephano*, and will treat plaintiff's causes of action for privacy and publicity together under the general rubric of privacy. In this connection, the court notes that the only element under the pre-*Stephano* cases which would distinguish the two theories—the re-

quirement that plaintiff have cultivated a valuable property interest in his public image—is without question satisfied in this case.

■ In examining the undisputed facts of this case with reference to plaintiff's summary judgment motion, it is immediately clear that two of the three prongs of the Civil Rights Law are satisfied. First, there is no question that the photograph said to be of plaintiff was used for commercial purposes, since it appeared in a magazine advertisement soliciting business for National Video franchisees. Second, defendants do not dispute that plaintiff never gave his consent to the use of the photograph, either orally or in writing. It therefore appears that the only element of plaintiff's case over which there is any serious dispute is whether the photograph is a "portrait or picture" of plaintiff.[4]

Plaintiff argues that Boroff's physical resemblance to him, when viewed in conjunction with the undeniable attempt to evoke plaintiff's image through the selection of props and poses, makes the photograph in question a "portrait or picture" of plaintiff as a matter of law. Plaintiff notes that it is not necessary that all persons seeing the photograph actually identify him, only that he be *identifiable* from the photograph. *Cohen v. Herbal Concepts, Inc.*, 63 N.Y.2d 379, 482 N.Y.S.2d 457, 459, 472 N.E.2d 307 (1984); *Negri v. Schering Corp.*, 333 F.Supp. 101, 104 (S.D.N.Y.1971). Plaintiff contends that it is beyond cavil that some people will recognize him in this photograph. The cited cases, however, involved photographs which were not disputed to be of the plaintiffs; the only question was whether the pictures were too old or too obscure to be recognizable. They do not help us answer the more basic question of whether the photograph in the case at

bar is, in fact, a "picture" or "portrait" of plaintiff.

More helpful are a line of cases holding that any recognizable likeness, not just an actual photograph, may qualify as a "portrait or picture." *See, e.g., Ali v. Playgirl*, 447 F.Supp. 723, 726 (S.D.N.Y.1978) ("clearly recognizable" drawing of plaintiff Muhammad Ali portrayed as boxer in ring, captioned "The Greatest," constitutes "portrait or picture"); *Young v. Greneker Studios, Inc.*, 175 Misc. 1027, 26 N.Y.S.2d 357, 358 (Sup.Ct.N.Y.Co.1941) (manikin made in plaintiff's likeness is "portrait or picture" within statute).

Therefore, if defendants had used, for example, a clearly recognizable painting or cartoon of plaintiff, it would certainly constitute a "portrait or picture" within the meaning of the statute. The case of a look-alike, however, is more problematic. A painting, drawing or manikin has no existence other than as a representation of something or someone; if the subject is recognizable, then the work is a "portrait." Defendant Boroff, however, is not a manikin. He is a person with a right to his own identity and his own face. Plaintiff's privacy claim therefore requires the court to answer the almost metaphysical question of when one person's face, presented in a certain context, becomes, as a matter of law, the face of another.

■ This question is not merely theoretical. The use in an advertisement of a drawing, which *has* no other purpose than to represent its subject, must give rise to a cause of action under the Civil Rights Law, because it raises the obvious implication that its subject has endorsed or is otherwise involved with the product being advertised. There is no question that this amounts to an appropriation of another's likeness for commercial advantage.

---

**4.** The claim of defendants Smith and Boroff that they did not use plaintiff's likeness "within this state" because the photograph was taken in Oregon is frivolous. Defendants' own written contract, which they argue was adopted through performance by National, called for the photograph to be used in "Video Review" magazine.

If plaintiff can otherwise establish his cause of action, the knowing participation of these defendants in creating a photograph for a national advertising campaign is sufficient to support a finding of use within the state when the advertisement was actually and foreseeably distributed in the state.

A living and breathing actor, however, has the right to exploit his or her own face for commercial gain. This right is itself protected by the Civil Rights Law. The privacy law does not prohibit one from evoking certain aspects of another's personality, *Lombardo*, but it does prohibit one from actually representing oneself as another person. *Binns v. Vitagraph Co. of America.* 210 N.Y. 51, 57, 103 N.E. 1108 (1913). The look-alike situation falls somewhere in between and therefore presents a difficult question.

The court is aware of only one case on point. In *Onassis v. Christian Dior N.Y. Inc.*, 122 Misc.2d 603, 472 N.Y.S.2d 254 (S.Ct.N.Y.Co.1983), plaintiff Jacqueline Kennedy Onassis won an injunction against an advertisement featuring a model who was made up to look like her. The advertisement was part of a series, which appeared for several weeks in major fashion and news magazines, featuring a trio of risque sophisticates known as "The Diors." The advertisements followed the developing relationship (and stunning Christian Dior wardrobes) of the imaginary menage a trois, including, in one week's installment, the marriage of two of the trio in a stylish, "legendary private affair." *Onassis*, 472 N.Y.S.2d at 257. Appearing among the guests at the soiree, which was portrayed in one large photograph, were several actual celebrities—actress Ruth Gordon, television personality Gene Shalit, and actress/model Shari Belefonte—and a Jacqueline Onassis double provided, as in this case, by Ron Smith's Celebrity Look-Alikes. *Id.*

The *Onassis* court found that the advertisement violated plaintiff's rights under section 51 of the Civil Rights Law. The court held that an exact duplication of plaintiff was not necessary to make out a cause of action under the statute, so long as the overall impression created clearly was that plaintiff had herself appeared in the advertisement. 472 N.Y.S.2d at 262.

> We are dealing here with actuality and appearance, where illusion often heightens reality and all is not quite what it seems. Is the illusionist to be free to step aside, having reaped the benefits of his creation, and be permitted to disclaim the very impression he sought to create? If we were to permit it, we would be sanctioning an obvious loophole to evade the statute. If a person is unwilling to give his or her endorsement to help sell a product, either at an offered price or any price, no matter—hire a double and the same effect is achieved.

472 N.Y.S.2d at 261.

The "illusion" created in *Onassis* was that plaintiff had actually appeared in the advertisement. Therefore, the court's holding was consistent with the long-standing requirement under section 51 that the commercial use complained of amount to a "portrait or picture" of an individual, not merely the suggestion of some aspect of a person's public persona. In other words, in the context of the advertisement, the look-alike's face was, as a matter of law, a portrait of Jacqueline Onassis. Important to the court's holding was the unusually realistic tone of the advertisement.

> The juxtaposition of the counterfeit figure just behind the real-life figures of a veteran actress, a TV personality, and a well-known model lends the whole ensemble an air of verisimilitude and accentuates the grievance, for it imparts an aura of authenticity to the trumped up tableau.

472 N.Y.S.2d at 262.

The question of whether a photograph presents a recognizable likeness of a person is ordinarily one for the jury. *Cohen v. Herbal Concepts, Inc.*, 63 N.Y.2d 379, 384, 482 N.Y.S.2d 457, 459, 472 N.E.2d 307 (1984). When, as in *Onassis*, the look-alike seems indistinguishable from the real person and the context of the advertisement clearly implies that he or she is the real celebrity, a court may hold as a matter of law that the look-alike's face is a "portrait or picture" of plaintiff. *Onassis* presented an unusual factual setting, in which the mixture of fantasy and reality suggested almost unavoidably the actual presence of the real-life celebrity. In order

for the court to reach the same conclusion in the present case, it must conclude on the undisputed facts that the photograph in question similarly creates, as a matter of law, the illusion of Woody Allen's actual presence in the advertisement.

■ It is not disputed here that in this photograph defendant Boroff is meant to look like Woody Allen. The pose, expression, and props all support the suggestion. However, the question before the court is not whether some, or even most, people will be *reminded* of plaintiff when they see this advertisement. In order to find that the photograph contains plaintiff's "portrait or picture," the court would have to conclude that most persons who could identify an actual photograph of plaintiff would be likely to think that this was actually his picture. This standard is necessary since we deal not with the question of whether an undisputed picture of plaintiff is recognizable to some, but whether an undisputed picture of defendant Boroff should be regarded, as a matter of law, to *be* a portrait or picture of plaintiff.

The court notes several factors that might militate against summary adjudication of this question. First, there are several physical differences between plaintiff's face and that of defendant Boroff. Defendant's photo shows larger eyebrows, a wider face, and more uneven complexion than plaintiff's, and somewhat different glasses than plaintiff generally wears.

Moreover, the hair style and expression, while characteristic of the endearing "schlemiel" embodied by plaintiff in his earlier comic works, are out of step with plaintiff's post-"Annie Hall" appearance and the serious image and somber mien that he has projected in recent years. While this distinction would be of no moment if defendants had appropriated an actual photograph of plaintiff from 15 years ago such as those submitted by plaintiff for comparison, *see Negri v. Schering Corp.*, 333 F.Supp. 101 (S.D.N.Y.1971), it is relevant to the question of whether the audience of movie watchers at whom this advertisement was aimed would conclude that plaintiff had actually appeared in the 1984 advertisement.

Finally, unlike in *Onassis*, where no other plausible interpretation was offered for the presence of the Jacqueline Onassis figure behind the real Ruth Gordon, et al., here defendants argue for a view of the advertisement consistent with the presence of a look-alike who is not thought to be Woody Allen himself. The court has some doubts as to the ultimate pursuasiveness of this interpretation. We are unable to conclude, however, that no reasonable jury could find that others would so interpret the advertisement, or at least recognize it to contain a look-alike, particularly in light of the distinctions noted above. Therefore, while the court finds that the advertisement at bar clearly makes *reference* to plaintiff, it hesitates to conclude that the photograph is, as a matter of law, plaintiff's portrait or picture.

The foregoing discussion may be helpful in focusing the novel questions presented by this case. The court feels, however, that the facts before it are better addressed in the context of an alleged Lanham Act violation. The substantive standard of likelihood of confusion provided by the Lanham Act, discussed below, seems more appropriate than the somewhat strained construction required here under section 51.[5]

Moreover, the relief available to plaintiff is virtually identical under either theory. Normally, under section 51, plaintiff would be entitled to an absolute injunction against

---

**5.** Since the New York Court of Appeals has subsumed the common law right of publicity within the relatively narrow statutory requirements of Section 51, it may fall to the state legislature to fashion a workable remedy to protect the pecuniary interests of celebrities in the market value of their identities and to protect the public from the false implication of endorsement. Controlling the use of a person's "portrait or picture" may be sufficient to protect the feelings of private citizens, but a broader statute modeled on the Lanham Act might provide fuller protection for the interests threatened when a celebrity's endorsement is implied without the use of an actual "portrait or picture."

the use of his picture, regardless of any perceived endorsement or lack thereof. On the unusual facts of this case, however, plaintiff would be limited to a prohibition against defendants representing that Boroff is actually Woody Allen. As addressed below, plaintiff may obtain essentially the same relief under the Lanham Act, and the court concludes that plaintiff is entitled to summary judgment on his Lanham Act claim.

Therefore, the court finds it unnecessary to resolve plaintiff's privacy claim. Defendants' motion for summary judgment on the privacy claim therefore also need not be reached, except to the extent that similar counter-arguments are offered in the context of the Lanham Act discussion below.

### Lanham Act Claim

 Plaintiff seeks summary judgment on his claim under section 43(a) of the federal Lanham Act, 15 U.S.C.A. section 1125(a) (West 1982) ("the Act"), which prohibits false descriptions of products or their origins. The Act is more than a mere codification of common law trademark infringement. Its purpose is "the protection of consumers and competitors from a wide variety of misrepresentations of products and services in commerce. In enacting the section, Congress in effect created a new federal statutory tort. The section is clearly remedial and should be broadly construed." *CBS, Inc. v. Springboard International Records*, 429 F.Supp. 563, 566 (S.D.N.Y.1976) (citations omitted) (hereinafter cited as *Springboard*). *See also Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir.1981); *Yameta Co. v. Capital Records, Inc.*, 279 F.Supp. 582, 586 (S.D.N.Y.), *rev'd on other grounds*, 393 F.2d 91 (2d Cir.1968).

 The Act has therefore been held to apply to situations that would not qualify formally as trademark infringement, but that involve unfair competitive practices resulting in actual or potential deception. *SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1065 (3d Cir.1980). *See also Springboard*, 429 F.Supp. at 567. To make out a cause of action under the Act, plaintiff must establish three elements: 1) involvement of goods or services, 2) effect on interstate commerce, and 3) a false designation of origin or false description of the goods or services. *Id.* at 566.

 Application of the act is limited, however, to potential deception which threatens economic interests analogous to those protected by trademark law. *Ives Laboratories, Inc. v. Darby Drug Co., Inc.*, 601 F.2d 631, 641–42 (2d Cir.1979). One such interest is that of the public to be free from harmful deception. Another interest, which provides plaintiff here with standing, is that of the "trademark" holder in the value of his distinctive mark. As the Supreme Court, per Justice Frankfurter, has said:

> The protection of trade-marks is the law's recognition of the psychological value of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising shortcut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of the mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. *Whatever the means employed, the aim is the same*—to convey through the mark, in the minds of the potential customer, the desirability of the comodity upon which it appears. Once this is attained, the trademark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress.

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 205, 62 S.Ct. 1022, 1023, 86 L.Ed. 1381 (1942) (emphasis added).

A celebrity has a similar commercial investment in the "drawing power" of his or her name and face in endorsing products and in marketing a career. The celebrity's

investment depends upon the good will of the public, and infringement of the celebrity's rights also implicates the public's interest in being free from deception when it relies on a public figure's endorsement in an advertisement. The underlying purposes of the Lanham Act therefore appear to be implicated in cases of misrepresentations regarding the endorsement of goods and services.

The Act's prohibitions, in fact, have been held to apply to misleading statements that a product or service has been endorsed by a public figure. In *Geisel v. Poynter Products, Inc.*, 283 F.Supp. 261 (S.D.N.Y. 1968), plaintiff, the well-known children's book author and artist known as "Dr. Seuss," sought to enjoin the use of his distinctive pseudonym in connection with dolls based on his characters. The court held that "a 'false representation', whether express or implied, that a product was authorized or approved by a particular person is actionable under [the Act]." *Id.* at 267, *citing Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir. 1958). The court further held that liability attached not just for descriptions that are literally false, but for those that create a "false impression." *Geisel*, 283 F.Supp. at 267. "The plaintiff is not required to prove actual palming off. A showing of the likelihood of consumer confusion as to the source of the goods is sufficient." *Id.* (citation omitted). Finally, the court held that a showing of actual consumer deception was not required in order to justify injunctive relief under the Act, so long as a "tendency to deceive" was demonstrated. *Id.* at 268.[6]

In *Cher v. Forum International, Ltd.*, 213 U.S.P.Q. 96 (C.D.Cal.1982), plaintiff, a popular singer and actress, brought a similar Lanham Act claim. Plaintiff sued when an interview she had granted to "US" magazine was sold to "Forum" magazine, a publication of Penthouse International. "Forum" published the interview and advertised it widely, falsely implying that plaintiff read and endorsed "Forum" and had granted the magazine an exclusive interview. *Id.* at 99–100. The court held that the Act "extends to misrepresentations in advertising as well as labelling of products and services in commerce," *id.* at 102, and noted that no finding of an actual trademark is required under the Act. *Id.* "The Lanham Act proscribes any false designation or representation in connection with any goods or services in interstate commerce," a standard which plaintiff Cher had met. *Id.*[7]

*Geisel* and *Cher* suggest that the unauthorized use of a person's name or photograph in a manner that creates the false impression that the party has endorsed a product or service in interstate commerce violates the Lanham Act. Application of this standard to the case at bar, however, is complicated by defendants' use of a look-alike for plaintiff, rather than plaintiff's actual photograph, as in *Cher*, or pseudonym, as in *Geisel*. Unlike the state law privacy claim discussed in the foregoing section, the plaintiff's Lanham Act theory does not require the court to find that defendant Boroff's photograph is, as a matter of law, plaintiff's "portrait or pic-

---

**6.** In subsequent proceedings, the court held that no violation of the Lanham Act existed after a given date because defendants had then changed the description on the dolls to make it clear that the toys were only based on the characters of Dr. Seuss, but were not specifically produced or endorsed by him. *Geisel v. Poynter Products, Inc.*, 295 F.Supp. 331, 354 (S.D.N.Y. 1968). The court stressed that defendants owned all rights, including the copyright, to the cartoon on which the dolls were based. Noting that this ownership right included the right to make reference to the source of the characters, the court compared the dolls to a musical comedy based on a book; reference to the common

source does not imply that the author of the original endorsed the adaptation. *Id.* The present case is plainly distinguishable, since defendants did not hold the rights to any of plaintiff's works such as would justify an otherwise impermissible implication that he was involved with their products or services.

**7.** The Court of Appeals affirmed and reversed in part, 692 F.2d 634 (9th Cir.1982), *cert. denied*, 462 U.S. 1120, 103 S.Ct. 3089, 77 L.Ed.2d 1350 (1983), expressly declining to rely upon or reach the Lanham Act theory. *Id.* at 637 n. 1.

ture." The court must nevertheless decide whether defendant's advertisement creates the likelihood of consumer confusion over whether plaintiff endorsed or was otherwise involved with National Video's goods and services. *See Geisel,* 283 F.Supp. at 267.[8]

This inquiry requires the court to consider whether the look-alike employed is sufficiently *similar* to plaintiff to create such a likelihood—an inquiry much like that made in cases involving similar, but not identical, trademarks. The court therefore finds it helpful, in applying the likelihood of confusion standard to the facts of this case, to refer to traditional trademark analysis.

■■■ Reference to this analysis is justified since the likelihood of confusion standard is applied to a wide variety of trademark and trademark-related causes of action. The standard is "the heart of a successful claim" under both the Lanham Act and common law trademark infringement. *Standard & Poor's Corp. v. Commodity Exchange, Inc.,* 683 F.2d 704, 708 (2d Cir. 1982). Other cases have held that the standard is applied in state law unfair competition cases as well as in trademark cases. *See, e.g., Shakey's, Inc. v. Covalt,* 704 F.2d 426, 431 (9th Cir.1983); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).

■■■ In *Standard and Poor's,* the Second Circuit suggested six factors for a court to consider in deciding the issue of likelihood of confusion: 1) the strength of plaintiff's marks and name; 2) the similarity of plaintiff's and defendant's marks; 3) the proximity of plaintiff's and defendant's products; 4) evidence of actual confusion as to source or sponsorship; 5) sophistication of the defendant's audience; and 6) defendant's good or bad faith. 683 F.2d at 708. *See also Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These factors provide a helpful structure for the court's application of the Lanham Act to the facts of this case.[9]

The first factor outlined in *Standard and Poor's,* the strength of plaintiff's mark, concerns the extent to which plaintiff has developed a favorable association for his mark in the public's mind. *See James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 276 (7th Cir. 1976). There is no dispute that plaintiff's name and likeness are well-known to the public, and that he has built up a considerable investment in his unique, positive public image. Plaintiff's "mark", to analogize from trademark law, is a strong one.

The similarity of the "marks"—i.e., the similarity of plaintiff to defendant Boroff— is the question posed by the second *Standard and Poor's* factor, and has already been addressed above. While the court was unable to hold that defendant Boroff's photograph was as a matter of law plaintiff's portrait or picture, the resemblance between the two is strong and not disputed.

---

**8.** The court rejects defendants' argument that the perception that plaintiff appeared in National's advertisement does not give rise to an inference that he endorses their product. It is disingenuous to suggest that consumers would assume no more than that plaintiff had been hired as an actor. When a public figure of Woody Allen's stature appears in an advertisement, his mere presence is inescapably to be interpreted as an endorsement. *Cf. Negri v. Schering Corp.,* 333 F.Supp. 101, 105 (1971); *Onassis v. Christian Dior N.Y. Inc.,* 122 Misc. 603, 472 N.Y.S.2d 254, 258–59 (S.Ct.N.Y.Co.1983). Moreover, defendant's pose in National's advertisement— smiling at the camera while holding up the V.I.P. card—is the classic stance of the product spokesperson.

**9.** In evaluating plaintiff's motion for summary judgment on his Lanham Act claim, the court observes that the first two elements under the Act clearly are established. First, the advertisement in question involves goods or services in that it solicits business for National's video rental franchises. Second, it involves interstate commerce since National's chain is nationwide, and the advertisement was placed in magazines having interstate distribution. The third element—false designation or description—requires the court to evaluate the likelihood of consumer confusion.

■ Under the third factor, proximity of the products, the court notes that while plaintiff does not own a video rental chain, he is involved in producing and distributing his own motion pictures, and he is strongly identified with movies in the public mind. The audience at which National Video's advertisement was aimed—movie watchers—is therefore the same audience to which plaintiff's own commercial efforts are directed. There is no requirement under the Act that plaintiff and defendant actually be in competition. *James Burrough*, 540 F.2d at 275.

■ The court has declined to rely on plaintiff's proffered consumer survey,[10] and plaintiff has submitted no other evidence of actual confusion. Under the fourth *Standard and Poor's* factor, such evidence, although highly probative of likelihood of confusion, is not required. *See generally Polyglycoat Corp. v. Environmental Chemicals, Inc.*, 509 F.Supp. 36 (S.D.N.Y.1980).

The sophistication of the relevant consuming public is measured under the fifth factor. The average reader of "Video Review" or customer of National Video is likely to be comparatively sophisticated about movies, such that a good number of them arguably would realize that plaintiff did not actually appear in the photograph. This is relevant to the question of whether the advertisement contained plaintiff's "portrait or picture." However, given the close resemblance between defendant Boroff's photograph and plaintiff, there is no reason to believe that the audience's relative sophistication eliminates all likelihood of confusion; at a cursory glance, many consumers, even sophisticated ones, are likely to be confused.

The final factor is the good or bad faith of defendants. While plaintiff has not established that defendants acted intentionally to fool people into thinking that plaintiff actually appeared in the advertisement, defendants admit that they designed the advertisement intentionally to evoke an association with plaintiff. They must therefore at least have been aware of the risk of consumer confusion, which militates against a finding that their motives were completely innocent. Defendants may not have intended to imply that plaintiff actually endorsed their product, but they happily risked creating that impression in an attempt to gain commercial advantage through reference to plaintiff's public image. The failure of defendant National to include any disclaimer on all but one of the uses of the photograph also supports a finding of, at best, dubious motives.

■ A review of all these factors leads the court to the inescapable conclusion that defendants' use of Boroff's photograph in their advertisement creates a likelihood of consumer confusion over plaintiff's endorsement or involvement. In reaching this conclusion, the court notes several distinctions between plaintiff's Lanham Act and privacy claims which make this case more appropriate for resolution under the Lanham Act.

■ First and most important, the likelihood of confusion standard applied herein is broader than the strict "portrait or picture" standard under the Civil Rights Law. Evocation of plaintiff's general persona is not enough to make out a violation of section 51, but it may create a likelihood of confusion under the Lanham Act. As the Second Circuit held in the trademark context, "In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir.1979) (citations omitted). *See also Estate of Elvis Presley v. Russen*, 513 F.Supp. 1339, 1371 (D.N.J. 1981). Similarly, even if the public does not believe that plaintiff actually appeared in the photograph, it may be led to believe by the intentional reference to plaintiff

---

**10.** See n. 3 supra.

that he is somehow involved in or approves of their product. This broader standard is justified since the Lanham Act seeks to protect not just plaintiff's property interest in his face, but the public's interest in avoiding deception.

Second, the likelihood of confusion standard is easier to satisfy on the facts of this case. Enough people may realize that the figure in the photograph is defendant Boroff to negate the conclusion that it amounts to a "portrait or picture" of plaintiff as a matter of law. All that is necessary to recover under the Act, however, is that a *likelihood* of confusion exist. While defendants, as noted above, have urged an interpretation of the advertisement which might defeat a finding of "portrait or picture," the court finds that no such explanation can remove the likelihood of confusion on the part of "any appreciable number of ordinarily prudent" consumers. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979). *See Warner Bros., Inc. v. American Broadcasting Companies, Inc.*, 530 F.Supp. 1187, 1198 (S.D.N.Y. 1982), *aff'd*, 720 F.2d 231 (2d Cir.1983).

■ Third, although the question of identifiability under the Civil Rights Law is generally one of fact for the jury, the likelihood of confusion standard may be applied by the court. While confusing similarity is technically a question of fact, it has sometimes been regarded as "one for the court to decide through its own analysis, comparison, and judgment." *Marquis Who's Who v. North American Ad. Assoc.*, 426 F.Supp. 139, 142 (D.D.C.1976), *aff'd*, 574 F.2d 637 (D.C.Cir.1977). *See also Continental Connector v. Continental Specialities*, 492 F.Supp. 1088, 1093 n. 3 (D. Conn 1979). It has therefore been held to be appropriate for summary adjudication. *Venetionaire Corporation of America v. A & P Import Co.*, 302 F.Supp. 156, 158 (S.D.N.Y.1969), *aff'd*, 429 F.2d 1079 (2d Cir. 1970). While some Second Circuit cases have emphasized the role of summary judgment in this area only in disposing of meritless cases, *see, e.g., Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 746 F.2d 112,

116 (2d Cir, 1984); *American Int'l Group, Inc. v. London Am. Int'l Corp. Ltd.*, 664 F.2d 348, 351 (2d Cir.1981), the court, at a minimum, has the analogous responsibility to grant summary judgment when no reasonable jury could fail to find a likelihood of confusion.

■ In seeking to forestall summary judgment, defendants Smith and Boroff maintain that the disclaimer which they insisted be included in the advertisement would have avoided consumer confusion. The court disagrees. Even with regard to the one version of the advertisement in which the requisite disclaimer was included, there exists a likelihood of consumer confusion. The disclaimer, in tiny print at the bottom of the page, is unlikely to be noticed by most readers as they are leafing through the magazine. Moreover, the disclaimer says only that a celebrity double is being used, which does not in and of itself necessarily dispel the impression that plaintiff is somehow involved with National's products or services. To be effective, a disclaimer would have to be bolder and make clear that plaintiff in no way endorses National, its products, or its services. *See Presley*, 513 F.Supp. at 1377–78. Having gone to great lengths to evoke plaintiff's image, defendants must do more than pay lip service to avoiding confusion. The disclaimer provided is insufficient as a matter of law.

■ Smith and Boroff also argue that they lacked sufficient control over the design of the advertisement and its placement to be jointly and severally liable to plaintiff along with National. This contention, too, is without merit. There is no dispute that defendants all knowingly agreed to include Boroff in the advertisement as a look-alike for plaintiff and that the pose and props in the photograph were intended to create an association with plaintiff. Defendants Smith and Boroff will not now be heard to plead ignorance when they intentionally created at least the risk of confusion.

The court concludes, on the undisputed facts before it, that a likelihood of consumer confusion exists in this case as a matter

of law. Plaintiff's motion for summary judgment on his Lanham Act claim therefore is granted against all defendants. The motion of defendants Smith and Boroff for summary judgment is denied.

■ Having established a likelihood of consumer confusion, plaintiff is entitled to injunctive relief under the Act. "Although it is necessary to prove that the buying public was actually deceived in order to recover damages under section 43(a) of the Lanham Act, only a likelihood of confusion or deception need be shown in order to obtain equitable relief." *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981) (citations omitted). *See Springboard,* 429 F.Supp. at 568. *See also Quabaug Rubber Co. v. Fabiano Shoe Company, Inc.,* 567 F.2d 154, 160 (1st Cir.1977); *Parkway Baking Co. v. Freihofer Baking Co.,* 255 F.2d 641, 649 (3d Cir.1958). The likelihood of confusion satisfies the requirement of irreparable harm, since the harm sought to be avoided includes protection of the public from false advertising. *Black Hills Jewelry Manufacturing Co. v. Gold Rush, Inc.,* 633 F.2d 746, 753 & n. 7 (8th Cir.1980).

■ Defendants have argued that any injunction against them must be limited in geographical scope to New York State. While such a limitation might be required for an injunction under the New York Civil Rights Law, given the differences in privacy law among different jurisdictions, an injunction under the Lanham Act need not be so limited. Plaintiff enjoys a nationwide reputation, and defendants advertised a nationally franchised business through a national magazine. The harm sought to be prevented is clearly not limited to the New York area, and the injunction must therefore be national in scope.

Plaintiff seeks an injunction preventing defendants from presenting defendant Boroff as plaintiff in advertising. Defendant Boroff argues that any such injunction would interfere impermissibly with his ability to earn a living and his First Amendment rights.

■ As defendants correctly point out, the scope of injunctions against misleading commercial speech should be limited to that necessary to avoid consumer confusion. For this reason, disclaimers are favored over outright bans. *See, e.g., In re R.J.M.,* 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982); *Consumer's Union of United States, Inc. v. General Signal Corp.,* 724 F.2d 1044, 1053 (2d Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). The court has already found, however, that the disclaimer appended to one of the advertisements before the court was inadequate as a matter of law to dispel a likelihood of consumer confusion. Nevertheless, the court hesitates sweepingly to enjoin defendant Boroff from ever appearing as a look-alike for plaintiff, since that could interfere with his ability to make money and express himself in settings where there is no likelihood of consumer confusion.

■ What plaintiff legitimately seeks to prevent is not simply defendant Boroff dressing up as plaintiff, but defendant *passing himself off* as plaintiff or an authorized surrogate. Therefore, defendant must be enjoined from appearing in advertising that creates the likelihood that a reasonable person might believe that he was really plaintiff or that plaintiff had approved of his appearance. *See Warner Bros., Inc. v. American Broadcasting Companies,* 720 F.2d 231, 246 (2d Cir.1983) (Congress prohibited only likelihood of confusion as to "average lay observer"). Defendant may satisfy the injunction by ceasing his work as a Woody Allen look-alike, but he may also satisfy it by simply refusing to collaborate with those advertisers, such as National Video in this case, who recklessly skirt the edges of misrepresentation. Defendant may sell his services as a look-alike in any setting where the overall context makes it completely clear that he *is* a look-alike and that plaintiff has nothing to do with the project—whether that is accomplished through a bold and unequivocal disclaimer, the staging of the photograph, or the accompanying advertis-

ing copy. This injunction applies as well to defendant Smith in his role as agent for defendant Boroff.[11]

### Defendants' Cross Claims

Defendants Smith and Boroff seek summary judgment against co-defendant National on their claim for indemnification under the putative written contract and for breach of contract. Boroff seeks summary judgment on his claim under the Civil Rights Law for the unauthorized use of his picture. Defendant National maintains that it rejected the written contract, and that the invoice sent by defendant Smith constitutes an unrestricted model release obviating defendants' other claims.

■ A written contract need not be signed to be binding against a party, so long as the party indicates through performance of its terms or other unequivocal acts that it intends to adopt the contract. *See* 1 Williston, *Law of Contracts*, section 90A at 291–93. This rule applies whether the contract question is to be decided under Oregon law as National asserts, *see Adair v. McAtee*, 385 P.2d 621 (Or.1963), or New York law. *See, e.g., Helen Whiting, Inc. v. Trojan Textile Co.*, 307 N.Y. 360, 364, 121 N.E.2d 367 (1954); *Joseph v. Atlantic Basin Iron Works*, 132 N.Y.S.2d 671, 673 (Sup.Ct.N.Y.Co.), aff'd, 285 App.Div. 1147, 143 N.Y.S.2d 601 (1st Dep't 1955).

■ It is not disputed that defendant National never specifically communicated to Smith and Boroff its unhappiness with the indemnification provision in the written contract form. The parties otherwise played their parts under the contract, with Boroff posing for photographs and National paying the invoice which accompanied the contract form. Nevertheless, the contract form did have a place for National to sign and the covering letter specifies that the signed contract is to be returned, which raises at least a question as to whether National thought it was adopting the entire written contract when it failed to sign and

return the form. Moreover, there was no prior course of dealing between National and Smith that would give rise to an inference that the parties understood such an indemnification clause to be customary. The court concludes that a material question of fact remains as to whether defendant National unequivocally adopted the entire written contract. Smith and Boroff's motion for summary judgment on their indemnification claim therefore must be denied.

Smith and Boroff also argue that by failing to include a disclaimer in all but one use of the photograph and by using the photograph in "Take One" magazine and in the countercard defendant National breached the contract between the parties and violated Boroff's rights under section 51 of the New York Civil Rights Law. They argue that National has conceded a prima facie case by admitting in its answer that it used Boroff's picture in New York State without his permission.

■ National moves to amend its answer to the cross claim to deny the allegation in light of its argument that the invoice sent by Smith constitutes a general release. Smith and Boroff oppose this motion as an eleventh hour attempt by National to introduce a new theory. The court disagrees. In the context of National's specific denials to every other material allegation made by Smith and Boroff, its admission in paragraph eight of its answer of the allegations made in paragraph 49 of Smith and Boroff's third cross-claim was clearly the result of a typographical or clerical error. National's motion to amend its answer therefore is granted.

■ Defendants Smith and Boroff nevertheless argue convincingly that defendant National's theory that the invoice constituted a general release must be rejected as frivolous. The invoice form, which was signed by neither Smith nor Boroff, merely summarizes the terms of

---

**11.** As noted above, n. 1 supra, plaintiff no longer seeks injunctive relief against defendant National.

the written contract and demands payment. Printed on the bottom are the words "NOTE: MODEL RELEASE NOT VALID UNTIL *THIS* INVOICE IS PAID" (emphasis added). Clearly, the invoice refers to some other document and was not intended itself to constitute a model release. Most likely that other document was the written contract form to which the invoice was appended. It is simply not plausible, given the specific terms contained in the accompanying written contract, that Smith and Boroff intended the invoice, standing alone, to constitute a general model release authorizing any use in any medium with no disclaimer. Even if this written contract is ultimately held not to have been adopted by the parties, National does not dispute that its oral contract with Smith and Boroff also required that a disclaimer appear on all uses of the photograph. Smith and Boroff could not have intended to waive this term by implication merely by accepting payment under the invoice.

█ In the absence of this putative general release, National's only written authorization to use Boroff's picture, as required by section 51 of the Civil Rights Law, was the written contract signed by Smith as Boroff's agent. This contract, however, specifically limited use of Boroff's picture to one or two appearances in "Video Review" magazine, required further written consent for any additional uses, and provided that a disclaimer would accompany all uses. Even where a plaintiff is a professional model who has otherwise consented to the commercial use of his or her photograph, New York law provides that any express limits on the written consent will be enforced. *Dzurenko v. Jordache, Inc.,* 59 N.Y.2d 788, 451 N.E.2d 477, 464 N.Y.S.2d 730 (1983); *Shields v. Gross,* 58 N.Y.2d 338, 448 N.E.2d 108, 461 N.Y.S.2d 254 (1983).

█ By using Boroff's photograph in "Take One" and on its countercards, both without disclaimers, National exceeded the written permission granted, and violated Boroff's rights under section 51 of the Civil Rights law. Defendant Boroff is therefore entitled to summary judgment on this claim. Boroff apparently does not seek injunctive relief; the question of damages must await trial.

█ Smith and Boroff are also entitled to summary judgment against National for breach of contract. While a material question of fact remains as to whether defendant National intended to adopt the terms of the written contract, National does not dispute that even its oral contract required disclaimers in all uses of Boroff's photograph. National therefore breached whichever contract is ultimately held to apply when it used Boroff's picture, with no disclaimer, in "Take One" and on its countercard. Damages on this claim as well must await trial.

CONCLUSION

Difficult questions of law and fact are presented by plaintiff's claim that the photograph of defendant Boroff used in defendant National Video's advertisements constitutes a "portrait or picture" of Woody Allen, entitling him to relief under New York's privacy statute. The court concludes that this case is more properly regarded as one for unfair competition under the Lanham Act, and that plaintiff may gain full relief on this theory. There is no question that the advertisements in question create at least a likelihood of consumer confusion as to whether plaintiff endorses National Video. Plaintiff therefore is entitled to summary judgment on his Lanham Act claim and an injunction against such potentially confusing use of defendant's photograph.

Material questions of fact remain as to whether defendant National intended to adopt all the terms of defendant Smith's written contract form. Defendants Smith and Boroff's motion for summary judgment on their claim for indemnification therefore must be denied. There being no material factual dispute that National exceeded Boroff's written permission by using his photograph in media not authorized, Boroff's motion for summary judgment on

his privacy claim is granted. Moreover, there being no material factual dispute that in failing to include a disclaimer in these uses National violated the terms of both the oral and written putative contracts, Smith and Boroff's motion for summary judgment for breach of contract must also be granted. The motions of plaintiff and defendant National Video to amend their pleadings are granted.